HELICOID GAGE DIVISION OF AMERICAN CHAIN AND CABLE COMPANY, Appellant,

v.

J. A. HOWELL et al., Appellees.

No. 843.

Court of Civil Appeals of Texas, Houston (14th Dist.)

June 26, 1974.

Rehearing Denied July 17, 1974.

A. J. Watkins, John C. Marshall, III, Watkins & Hamilton, Houston, for appellant.

Jim M. Perdue, Miller, Gann, Perdue & Draughn, Hal S. Hudson, Lucas & Hudson, Wayne Fisher, Fisher, Roch, Blackstock & McLendon, Michael T. Johnson, Frank J. Knapp, Jr., Michael O. Connelly, Butler, Binion, Rice, Cook & Knapp, Houston, for appellees.

CURTISS BROWN, Justice.

This is a products liability case.

Appellee J. A. Howell brought suit against appellant Helicoid Gage Division of American Chain & Cable Company (Helicoid) and the Houston Supply Company for personal injuries which he received when a gage manufactured by Helicoid and supplied by Houston Supply burst while in use. A piece of the lens of the gage was thrown into Howell's right eye by the force of the explosion, resulting eventually in the loss of the eye. Houston Supply Company was granted an instructed verdict at the close of the evidence. This action is not complained of on appeal by either Howell or Helicoid. After submis-

sion of the case to the jury on special issues, the trial court entered judgment on the verdict that Howell recover from Helicoid $246,302.33.

Howell was an employee of Loomis Hydraulic Testing Service, a company which specializes in the pressure testing of joints in oil field tubing. Howell was a member of a crew testing a new unit on which the gage in question was being utilized. The testing unit worked as follows: a pressure medium would be pumped into a sealed-off section of pipe until it reached a desired pressure; then the gage reading would indicate whether there were any leaks. During the test in question, Loomis was using a pressure medium of water mixed with soluble oil. Howell's job had been to hold down a hose in a fifty-five gallon drum to supply the pressure medium to the pump. Several times during the test this hose vibrated loose, came up and took in air. In addition, this was a new, experimental unit, and it was discovered during the test that the pump utilized was not sufficient and that it was taking in air itself. When the gage failed, the entrapped air caused a violent explosion, and a stream of water burst out through the front of the gage, shattering the lucite lens, and throwing a piece into Howell's eye. Although the evidence is conflicting, there is ample proof that the gage was new and exploded after only about thirty minutes of use. It is undisputed that the pressure at the time of the injury was substantially less than the maximum 20,000 pounds per square inch of pressure which the gage was designed to measure.

In recent years the doctrine of products liability has become well accepted in Texas, and our Supreme Court has expressed approval of the doctrine as expressed in Restatement (Second) of Torts § 402A (1965). McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.Sup.1967); Shamrock Fuel and Oil Sales Co. v. Tunks, 416 S.W.2d 779 (Tex.Sup.1967). Section 402A of the Restatement provides as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

A product may be rendered defective through a defect in material or manufacture, a defect in design, or the failure to warn properly of a dangerous product characteristic. McKisson v. Sales Affiliates, Inc., *supra;* Pizza Inn, Inc. v. Tiffany, 454 S.W.2d 420 (Tex.Civ.App.-Waco 1970, no writ); Noel, Products Defective Because of Inadequate Directions or Warnings, 23 SW.L.J. 256 (1969). To recover in a products liability case, it is necessary for the plaintiff to show that the product was defective in one of these ways, that the defect made the product unreasonably dangerous, and that the defect was a producing cause of his injuries. No showing of proximate causation is required, and traditional contributory negligence does not bar recovery. Shamrock Fuel & Oil Sales Co. v. Tunks, *supra.* Defenses in a products liability case include misuse of the product and voluntary and unreasonable use in the face of a known danger, also known as assumption of risk. McDevitt v. Standard Oil Company of Texas, 391 F.2d 364 (5th Cir. 1968); Re-

statement (Second) of Torts § 402A comment n (1965).

In response to special issues, the jury made a number of fact findings. We have reviewed these fact findings under the proper tests for no evidence, insufficient evidence, and great weight points, and find they are all amply supported by the evidence. *See* Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Texas L.Rev. 361 (1960). The jury found that use of the gage with water was a reasonably foreseeable use, that it exposed the users to an unreasonable risk of harm, that Helicoid failed to warn both purchasers and users of the danger of the use with water, that this failure to warn also exposed users to an unreasonable risk of harm, and that this failure was a producing cause of Howell's injuries. The jury found that Helicoid's failure to equip the gage with a safety shield rendered it defective and that this failure was a producing cause of Howell's injuries. It found that the design of blow-out discs on the gage was defective and was a producing cause of his injuries. It found that the lucite lens used on the gage was not fit to prevent injury as the result of failure or explosion, that this failure exposed users to an unreasonable risk of harm, and that the failure was a producing cause of Howell's injuries.

In response to the defensive issues, the jury found that Loomis did not use the gage with salt water. It found that Loomis did use the gage with water but that such a use was not a misuse. It further found that Loomis used the gage in such a way as to allow air to become entrapped in the pressure medium, but also found that this was not a misuse. In response to several other issues, the jury found that Loomis was not negligent in its selection or use of the gage without additional safety features and that this was not a misuse. Finally, the jury awarded the following damages: past physical pain and mental anguish, $70,000; future physical pain and mental anguish, $75,000; past loss of earn-

ings $5,000; future loss of earning capacity, $100,000. This award was adjusted in the judgment by the addition of stipulated medical expenses and the subtraction of recovery by the intervenor insurance company which had paid Howell's workmen's compensation claim.

The evidence establishes that Helicoid offered two alternatives to a glass lens. One was a lucite lens; the other, a shatterproof glass lens. According to testimony by experts for both parties, a lucite lens is more resistant to breakage from a sudden blow than regular glass, but, when it does break, it shatters much in the same manner as glass. On the other hand, shatterproof glass crumbles into small fragments without jagged edges, thereby greatly reducing the possibility of injury. The Helicoid catalogue offered the lucite lens as a safety option for gages to be used with high pressure service, and it did not differentiate its properties from those of shatterproof glass, but essentially equated the two. Loomis' purchasing officer testified that he believed that the lucite lens and blow-out discs on the gage fully equipped it with the available safety devices.

The gages in question work by forcing a pressure medium into a small metal tube (called a bourdon tube) inside the gage. This tube is slightly curved, and when enough pressure is applied, it moves slightly, thereby causing the gage needle to move through a system of springs and levers. In the event that a slow leak of pressure develops inside the gage, the blow-out discs are designed to pop out of their holes in the back of the gage case, relieving the pressure inside the gage. Nevertheless, in the event of a sudden explosion of the pressure medium, if the rupture in the bourdon tube occurs on its front side, there is nothing to prevent the pressure medium from bursting through the face and lens of the gage. In that event the lucite lens would foreseeably shatter like glass. It was, therefore, not fit to prevent injury from an explosion.

To determine whether a product is unreasonably dangerous, as outlined in the design case of Metal Window Products Co. v. Magnusen, 485 S.W.2d 355 (Tex.Civ. App.-Houston [14th Dist.] 1972, writ ref'd n. r. e.), it is necessary to weigh the risk of harm against the utility of the product, considering whether safety devices would unreasonably raise the cost or diminish the utility of the product. The evidence at trial showed that shatterproof glass would have increased the cost of each gage by approximately one dollar and would not have reduced the gage's utility. Further, there was testimony that this injury would not have occurred had shatterproof glass been used.

Appellant Helicoid contends that it had no duty to equip the gages with all of the available safety devices. Rather, it would place the burden on an industrial purchaser to make the proper choice of safety devices to fit its particular needs. Such a position is untenable in this case, because Helicoid's catalogue fails to inform the purchaser as to the need for, and differences among, its safety devices. As explained previously, the catalogue does not differentiate between the lucite lens and shatterproof glass. Testimony at trial showed that the blow-out discs would be ineffective in the event of a sudden rupture in the bourdon tube in the direction of the face of the gage, unless a safety shield option was also purchased. The catalogue also makes no mention of this. The gage in question was a high pressure gage calibrated to measure pressure up to 20,000 pounds per square inch. The cost of adding a safety shield would have been in the range of two to two and one-half dollars. The utility of the gage would not have been diminished in any way by the use of this inexpensive safety device. In a high pressure gage, the use of such an inexpensive and effective safety shield should have been standard and not left as an "option" to a purchaser, industrial or otherwise. *See* Holford, Strict Liability for Product Design and Manufacture, 52 Texas L.Rev. 81, 97 (1973).

■ As an additional basis for the judgment, the jury found that Helicoid failed to warn purchasers and users of the danger of using this gage with water. Helicoid claims that in an industrial context users need not receive a warning, and that the manufacturer can rely on the employer to inform its employees. The Court of Appeals for the Fifth Circuit recently discussed this matter in Borel v. Fibreboard Paper Products Corporation, 493 F. 2d 1076 (5th Cir. 1973), holding that the manufacturer had a duty to warn the employee-user as well as the employer-purchaser. We need not reach that question, because Helicoid's catalogue was insufficient to warn either purchasers or users. In addition the installation information which Helicoid included with each packaged gage contained no meaningful warnings. The Helicoid catalogue listed several types of gages as suitable for use with a water pressure medium. It recommended that this gage not be used with a medium corrosive to steel. The ultimate failure of the bourdon tube was due to corrosion. Nevertheless, Loomis used ordinary water as a pressure medium mixed with soluble oil. The expert testimony established that this mixture would not necessarily be corrosive to steel within the time span of contemplated usage. Furthermore, the catalogue instructions do not amount to a warning. It could be inferred that use with water service would merely shorten the life of the gage or, perhaps, not register pressure correctly. There is no indication that use with water carried a danger of bourdon tube failure and explosion. These findings of the jury on failure to warn are in themselves sufficient to support the judgment.

■ Appellant complains that several definitons given to the jury by the court were improperly keyed to the contemplation of the user rather than the purchaser of a product. This complaint applies to the definitions of "unreasonable risk of harm" and to the definition of "defective or defectively designed." Comment i to §

402A defines "unreasonably dangerous" as "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Comment g defines "defective condition" as "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." The trial court in its definitions substituted the word "user" for the words "consumer" and "ultimate consumer" in the comments' definitions. The language of § 402A, accepted by the courts of this state, contemplates danger to both consumers and users. *See* Metal Window Products Co. v. Magnusen, *supra*; Restatement (Second) of Torts, § 402A comment i (1965). Contrary to appellant's argument, § 402A does not equate consumers with purchasers. Comment 1 provides that one need not have purchased a product to be a consumer. Comment 1 actually uses "user" and "consumer" almost interchangeably and notes that a user or consumer may be an employee of the final purchaser. In the industrial context, it is almost always the situation that the purchaser is not the user. This was so here, and, therefore, the court's definitions were correct in this case. Appellant confuses this question with the question of whom the manufacturer must warn. That question involves a decision as to how much responsibility the manufacturer can delegate to an employer for the safety of his employees. The definitions of "unreasonable risk of harm" and "defective or defectively designed" were, and should have been, keyed to the mind of the person who would be injured by the dangerous product, because if that person proceeds in the face of the known defect or known unreasonable risk of harm, his actions constitute a defense for the manufacturer. *See* Restatement (Second) of Torts § 402A comment n (1965).

Appellant also contends that the damages assessed were excessive. Without in any way diminishing the very serious nature of plaintiff's injury and the serious consequences thereof, the award does seem overly generous. We recognize that it is the function of the jury to fix damages in such cases. It is our duty, however, to review the jury's findings under appropriate rules established by our Supreme Court. The trial court also has a significant review role on motion for new trial with respect to the amount of damages. We have reviewed the evidence under these standards and cannot say that this is an appropriate case for a remittitur. *See* Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835 (1959); Dallas Ry. & Terminal Co. v. Farnsworth, 148 Tex. 584, 227 S.W.2d 1017 (1950); Bill Hendrix Auto Parts v. Blackburn, 433 S.W.2d 237 (Tex.Civ.App.-Houston [14th Dist.] 1968, no writ).

Appellant's points of error are overruled and the judgment of the court below is affirmed.

Affirmed.